marks that have been found merely descriptive. For example, "SnakeLight" denotes a flexible light, akin to a snake. See Black & Decker, 15 F. Supp. 2d at 225-26. Certainly the consumer must use his or her imagination to envision a flexible light from the name "SnakeLight"; yet, because the mark directly described a feature of a flexible light, the court found it was descriptive. Id. Similarly, the "Micro-Precision" mark does little to conjure up the image of wheel balancers, yet the Ninth Circuit concluded that, because it directly described one of the attributes of the product - its exacting accuracy - it was descriptive. See Bada, 426 F.2d at 11. Under the case law cited by the parties, the mark "Would you rather . . .?" fails the imagination test for suggestiveness.

The second test for suggestiveness looks to the extent of third-party use of the same mark. See 555-1212.com, 157 F. Supp. 2d at 1089 (finding the mark "555-1212.com" descriptive based partly upon 123 other web sites with either "555" or "1212" in their domain names). Here, as discussed supra, Zobmondo offers many undisputed instances in which the phrase "Would you rather . . .?" appears to denote dilemmas similar to those used in the parties' games. Beyond the books in which this concept appears, Zobmondo also offers printouts from multiple web sites that offer the same sort of dilemmas (some less absurd than others) under the nomenclature of "Would you rather . . .?" (Supp. Korn Decl. ¶ 7, Ex. E.) This evidence is relevant to the descriptive/suggestive inquiry because

> [i]n determining whether a word or syllable has a descriptive or suggestive significance as applied to merchandise it is proper to take notice of the extent to which it has been used in trademarks by others on such merchandise. If it has been frequently so used, the inference is warranted that it is not purely arbitrary; that it would likely be understood by purchasers as identifying

> or describing the merchandise itself, rather than the source thereof, and hence as having little or no trademark significance.

Shoe Corp. of Amer. v. Juvenile Shoe Corp., 266 F.2d 793, 796 (C.C.P.A. 1959). Falls Media does not dispute this evidence presented by Zobmondo, and, in fact, hardly addresses the third-party use of the "Would you rather . . .?" phrase, other than through its expert's testimony that no game embodies the concept. As the Court concluded above, this does not create a genuine issue to preclude summary judgment on this issue.[16] Under the third-party use test, Zobmondo has demonstrated that the "Would you rather . . .?" mark is descriptive, not suggestive.[17]

---

[16]In fact, Falls Media seems confused over Zobmondo's purpose for offering this evidence. To counter this evidence, Falls Media argues: (1) it was unaware of these third party uses when it filed its trademark application; (2) single book titles cannot be protected as trademarks in any event; and (3) the authors of these other books never asserted trademark rights to the titles. (Trademark Opp'n at 21:12-22:9.) These points are irrelevant to the distinctiveness of the "Would you rather . . .?" mark. Zobmondo's point is not that Falls Media's registration is invalid because of prior undisclosed trademark use of "Would you rather . . .?", but that the mark itself is descriptive because of its prevalence in consumers' collective consciousness. Certainly references to the phrase "Would you rather . . .?" and its attendant dilemma concept are relevant to determining whether the mark is merely descriptive of a game based on this concept. See 555-1212.com, 157 F. Supp. 2d at 1089.

[17]At oral argument, Falls Media cited Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167 (2d Cir. 1976) to suggest that Zobmondo's proof of third-party use is lacking. In that case, the defendant attempted to demonstrate that the plaintiff's mark was weak by citing other registered marks using the word "Vera." Id. at 1173. However, the defendant "introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers," so "the existence of these registrations is not evidence of what happens in the market place or that customers are familiar with their use." Id. (citation omitted). The opposite is true in this case; Zobmondo has not offered trademark registrations, but evidence that books using similar "Would you rather" phrases have been introduced into the marketplace by other

(continued...)

The third test involves assessing competitors' need to use this mark in describing similar goods:

> [If] the suggestion made by the mark [is] so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods [or services] . . . this tends to indicate that the mark is merely suggestive, not descriptive. If, however, the message conveyed by the mark about the goods or services is so direct and clear that competing sellers would be likely to [need to] use the term in describing or advertising their goods [or services], then this indicates that the mark is descriptive.

Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1218 (9th Cir. 1987) (quoting 1 McCarthy on Trademarks & Unfair Competition, § 11:21 at 493 (2d ed. 1984) (brackets in original)). This principle springs from the concern that trademark holders may not monopolize the English language and prevent competitors from fairly and accurately describing their goods. See Bada, 426 F.2d at 11.

Unlike the "imagination" and the "third-party use" tests, this test proves difficult to apply in this case. Falls Media points out that Zobmondo identified at least 130 alternative names for its board game. (Trademark GI No. 49.) Also, when Hasbro distributed Zobmondo's game for two years, it did so under the name "Zobmondo!! The Outrageous Game of Bizarre Choices," and experienced success in doing so. (Id. Nos. 57, 66.) Zobmondo also published a book embodying the "Would you rather . . .?" concept, but did not have the phrase in the title, and sold 132,000 copies. (Id. No. 67.) Finally,

---

[17](...continued) users. Zobmondo might have made a stronger showing of pervasiveness in the market, but that does not render entirely irrelevant the actual third-party use in the marketplace, which Falls Media has not disputed. Scarves by Vera also analyzed this issue in addressing whether the plaintiff could transfer its mark from women's scarves, apparel, and linens to cosmetics and fragrances, an issue not raised by this case. See id. at 1169.

Falls Media demanded that a competitor stop selling board games under the title "Would You Rather?", and the competitor immediately changed its name to "Would You Prefer?" (Id. No. 68.)

Zobmondo does not dispute these facts, but argues that the competitors' needs test is not based on whether another mark could be used for the goods, but rather, whether a court should compel a producer to use another mark. True, Falls Media's registration of the "Would you rather . . .?" mark monopolizes it for use on games. But the point of the competitors' needs test is to determine whether a single competitor in the market has "impoverish[ed] the language of commerce by preventing his fellows from fairly describing their own goods." Bada, 426 F.2d at 11. Zobmondo claims that the "Would you rather . . .?" concept – the choice between two alternatives by beginning each proposition with the phrase "Would you rather . . .?" – is so ingrained in our culture that naming its game anything else, even if possible, prevents it from accurately describing the game concept and gives Falls Media a monopoly over the language of "Would you rather . . .?" in commerce.

The Court need not decide this question. These three tests for distinctiveness are merely factors to consider in deciding whether a term is suggestive or descriptive, and others, although not addressed by the parties here, may also be relevant. See 2 McCarthy on Trademarks & Unfair Competition § 11:71 (4th ed. 2008) (noting six factors, including the imagination test, the third-party use test, and the competitor's needs test). In fact, the court in Self-Realization applied only the "the primary criterion" of "the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to a particular product," to find the

mark at issue descriptive, not suggestive. See Self-Realization, 59 F.3d at 911. The Ninth Circuit regularly decides the descriptive/suggestive question by applying only the imagination test. See, e.g., Rudolph Int'l, Inc. v. Realys, Inc., 482 F.3d 1195, 1198 (9th Cir. 2007) (affirming summary judgment that "disinfectable" was not suggestive because it failed the imagination test); Japan Telecom, Inc. v. Japan Telecom Amer., Inc., 287 F.3d 866, 873 (9th Cir. 2002) (affirming summary judgment that "Japan Telecom" was not suggestive under the imagination test). Zobmondo has made a sufficient showing that, under both the imagination and third-party use tests, the "Would you rather . . .?" mark is descriptive, even if alternative marks might exist to describe a similar concept.

In the end, Falls Media raises no factual issue that the "Would you rather . . .?" mark is descriptive, not suggestive. Zobmondo has carried its burden by a preponderance of the evidence to rebut the presumption of validity Falls Media enjoyed through its federal registration. The burden now shifts to Falls Media to demonstrate secondary meaning in the mark "Would you rather . . .?". See 555-1212.com, 157 F. Supp. 2d at 1089.[18]

---

[18]The Court is not persuaded by Falls Media's argument that the attempts of Zobmondo's owner, Randall Horn, to register the "Would you rather . . .?" mark somehow legally bar Zobmondo's challenges. See, e.g., Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 38 (1st Cir. 2006). In Attrezzi, the court merely recognized that a conflicting representation before the PTO on the strength of a mark was only one factor to be considered in determining distinctiveness: "It does not help Maytag any that the PTO had originally balked at Maytag's own application and then given way when Maytag urged the PTO that Attrezzi was suggestive rather than descriptive as applied to Maytag's kitchen appliances." Id. Here, Zobmondo's application was rejected based upon Falls Media's earlier application, not on the distinctiveness of the mark. (See Trademark GI No. 40.) Horn asserts that he had no attorney and did not understand trademark law at that time. (See Horn (continued...)

2. Falls Media Has Not Established Secondary Meaning in the "Would you rather . . .?" Mark.

The parties first dispute the burden of proof on the issue of secondary meaning. Falls Media claims that Zobmondo has the burden to demonstrate that it is entitled to summary judgment, which is correct. See, e.g., Celotex, 477 U.S. at 323. However, once Zobmondo makes a prima facie showing that no genuine issues of fact exist, Falls Media must offer evidence to create a genuine issue. See Fed. R. Civ. Proc. 56(e) (stating that, once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings . . . [T]he adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial.").

In the context of secondary meaning, at trial Falls Media must meet "vigorous evidentiary requirements" that would allow a jury to conclude that the "Would you rather . . .?" mark, in the hands of Falls Media, has gained secondary meaning. PaperCutter, 900 F.2d at 564 ("The existence of secondary meaning is a question of fact with the burden of proof on the party claiming the exclusive rights in the designation."). Notably, "[t]his burden does not shift upon a decision of the Patent and Trademark Office to register the mark, absent evidence that the Office registered the mark upon finding that it had acquired secondary meaning." Id. In this case, the PTO did

---

[18](...continued) Supp. Decl. ¶¶ 3-4.) Two years after this rejection, Zobmondo opposed Falls Media's application. (Trademark GI Nos. 40, 52.) Even if the Court accepts that Horn believed the mark was distinctive at that time, the Court is not compelled to change its analysis or conclusions.

not make a finding as to the secondary meaning of Falls Media's mark. (Trademark Opp'n at 11:18-20.) Therefore, the Court will first address Zobmondo's claim that no genuine issue exists over secondary meaning, and if so, whether Falls Media has offered enough evidence that, if believed, would meet its rigorous burden of proof.

When a mark is descriptive, it must have acquired "secondary meaning" to be protected as a trademark. See Self-Realization, 59 F.3d at 910. "[T]he basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source." Id. at 911; see also PaperCutter, 900 F.2d at 564 (noting that secondary meaning exists "if the term, although not inherently distinctive, comes through use to be uniquely associated with a single source."). In other words, secondary meaning must create an association in the buyer's mind between the mark and the producer, not simply the mark and the product. See, e.g., Self-Realization, 59 F.3d at 911 (requiring association between the "Self-Realization" mark and "'Self-Realization' literature, tapes, and services" and the producer claiming trademark rights).

As an initial matter, the parties dispute when secondary meaning must be established. Zobmondo claims that secondary meaning must be established prior to the challenged junior use: "To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before the competitor commenced use of the mark." PaperCutter, 900 F.2d at 564; see also Black & Decker, 944 F. Supp. at 227 ("The critical question is whether Dunsford's mark had achieved secondary meaning prior to the time Black & Decker commenced use of the mark."). According to Zobmondo, Falls

Media must have established secondary meaning between 1997, when Falls Media filed its registration, and 1998, when Zobmondo introduced its first game on the market. In contrast, Falls Media argues that it had a statutory constructive priority use date in 1997, so any secondary meaning must be measured between then and the present because "[t]he [intent to use] applicant can never prove that it acquired a secondary meaning in the junior user's territory before the junior user began use. A court which requires such a showing would undermine much of the rationale behind the theory of constructive use priority[.]" 3 McCarthy on Trademarks & Unfair Competition § 19:30 (4th ed. 2008) (emphasis in original). This issue is critical because Falls Media cannot survive summary judgment if the relevant time period does not extend to the present.

The Court concludes that the relevant time period to measure secondary meaning begins in 1997, when Falls Media first began distributing books under the "Would you rather . . .?" registration and ends in 2002, when Zobmondo first introduced its board game with "Would you rather . . .?" prominently displayed on the box. Authority is clear that, in the normal case, secondary meaning must be achieved prior to the junior user's first use. See PaperCutter, 900 F.2d at 564; Black & Decker, 944 F. Supp. at 227. Falls Media argues that applying that precept here would eviscerate the benefits gained from the constructive use rights afforded under the Lanham Act. See Dunn Computer Corp. v. Loudcloud, Inc., 133 F. Supp. 2d 823, 832 (E.D. Va. 2001) (noting that filing a registration "establishes only a constructive use of the mark which, upon registration, has the same legal effect as actual use of a trademark at common law." (citation omitted)). The Second Circuit explained the purpose of the intent-to-

use application process:

> Prior to 1988, an applicant for trademark registration had to have used the mark in commerce before making the application. Following the enactment of the [intent-to-use] provisions in that year, a person could seek registration of a mark not already in commercial use by alleging a bona fide intent to use it. See 15 U.S.C. § 1051(b). Registration may be granted only if, absent a grant of extension, the applicant files a statement of commercial use within six months of the date on which the Commissioner's notice allowance pursuant to 15 U.S.C. § 1063(b) is issued.

Warnervision Entm't Inc. v. Empire of Carolina, Inc., 101 F.3d 259, 260 (2d Cir. 1996).

At first blush, requiring Falls Media to establish secondary meaning prior to issuance of its registration seems to thwart the congressional intent underlying this provision. However, priority and distinctiveness are separate; even if an intent-to-use applicant is granted constructive use priority, that priority will not protect a proposed generic mark or a descriptive mark that lacks secondary meaning. McCarthy recognizes that the PTO allows intent-to-use applications that rest on "acquired distinctiveness" through secondary meaning: "In 1990, the PTO promulgated an Examination Guideline that permits an [intent-to-use] applicant to prove secondary meaning for a non-used mark by arguing that secondary meaning acquired for the same mark for related goods or services will 'transfer to the goods and services in the application' when, and if, the mark is used on those goods and services." 2 McCarthy on Trademarks & Unfair Competition § 15:65 (4th ed. 2008). Based on this principle, the Federal Circuit has concluded that an intent-to-use applicant of a descriptive mark must show either "that it has used the mark since the date of its application and the mark acquired secondary meaning," or "that [the] 'same mark' acquired distinctiveness for related goods or services,

and that this acquired distinctiveness will transfer to the goods or services specified in the application when the mark is used in connection with them." In re Dial-A-Mattress Operating Corp., 240 F.3d 1341, 1347 (Fed. Cir. 2001).[19] Therefore, the Court can require Falls Media to demonstrate secondary meaning for its descriptive mark in determining whether the mark is valid without eviscerating Falls Media's rights of constructive priority use.[20]

Secondary meaning is measured by the following factors: "(1) whether the actual purchasers of the product bearing the claimed trademark associate the trademark with the producer; (2) the degree

---

[19]At oral argument, Falls Media cited two Trademark Trial and Appeal Board (the "Board") decisions that suggest that secondary meaning must be measured at the time of registration - here, July 2005. See Harsco Corp. v. Electrical Sciences, Inc., 9 U.S.P.Q.2d 1570 (T.T.A.B. 1988); Eveready Battery Co. v. The Gillette Co., 2005 WL 663509 (T.T.A.B. 2005) (non-precedential). In the cancellation proceeding in Harsco (which did not involve an intent-to-use application), the Board decided that, as between the time of registration and a later date during the cancellation proceeding, the time of registration should be used to measure distinctiveness. 9 U.S.P.Q.2d at 1571. In a footnote in the non-precedential decision in Eveready, the Board suggested that distinctiveness must be measured at the time of registration, even in an intent-to-use application. 2005 WL 663509, at *3 n.6. However, the Board relied on Neapco Inc. v. Dana Corp., 12 U.S.P.Q.2d 1746, 1747 (T.T.A.B. 1989), which did not involve an intent-to-use application and decided only that distinctiveness can be measured either at the time of registration or at the time of a later cancellation proceeding. These decisions do not change the Court's analysis.

[20]Here, there is no need to force Falls Media to demonstrate that its use of the "Would you rather . . .?" mark on books would transfer to board games under an "acquired distinctiveness" analysis (which it has not done in any event). Even assuming Falls Media's use of the mark on books directly transfers to board games, Falls Media cannot demonstrate secondary meaning for using the mark with books and board games up to 2002. Similarly, the Court declines Zobmondo's invitation to end the relevant period in 1998, when Zobmondo issued a game with the tagline, Zobmondo!! That Crazy "Would You Rather" Game. (Trademark UF No. 9.) Even measuring from the broader 1997-to-2002 time period, Falls Media has failed to establish secondary meaning.

and manner of advertising under the claimed trademark; (3) the length and manner of use of the claimed trademark; and (4) whether the use of the claimed trademark has been exclusive." Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985) (citations and quotations omitted). "An expert survey of purchasers can provide the most persuasive evidence on secondary meaning." Id. Moreover, "proof of copying strongly supports an inference of secondary meaning." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989). Finally, actual consumer confusion is relevant to determining secondary meaning. 2 McCarthy on Trademarks & Unfair Competition § 15:37 (4th ed. 2008).

Falls Media admitted in interrogatory responses that it only had two books on the market between 1997 and 2002, which sold a total of 91,358 copies for total net sales of $71,571.18. (Korn Decl., Ex. Q at 1048-52.) Falls Media's publisher, Dutton Plume, expended $18,000 in advertising in 1997 and Falls Media spent $155 each year between 1997 and 2002. (Trademark UF No. 30.)

Courts have routinely found amounts of sales and advertising at these levels insufficient to create secondary meaning. See, e.g., Black & Decker, 944 F. Supp. at 227 (no secondary meaning based on $80,000 in sales over five years and $3,000 in advertising over seven months); Ideal World Marketing, 15 F. Supp. 2d at 246 (no secondary meaning based on 6,610 units sold in 31 states in one year and one news article mentioning product); Continental Lab. Prods., Inc. v. Medax Int'l, Inc., 114 F. Supp. 2d 992, 1002-03 (S.D. Cal. 2000) (no secondary meaning based on $15,000 a year over seven years in advertising and sales of 229,000 units for $4.76 million in the absence of evidence of market size and share). Moreover, as the court

recognized in Continential Laboratory, Falls Media does not place these numbers in context, so the Court does not know the relevant market or Falls Media's percent of market share or whether customers are repeat or new. 114 F. Supp. 2d at 1002-03. Even absent contextual evidence, however, the Court can confidently conclude that the overall market for books (or even more narrowly, the mark for novelty books like Falls Media's) dwarfs Falls Media's sales and advertising figures.

To supplement these numbers, Falls Media claims that, since 1997, Falls Media has promoted its products via its web site, which receives 30,000 unique visitors each month and that it sends email "blitzes" to customers. (Trademark GI Nos. 85, 86.) Falls Media claims that hundreds of radio stations have promoted Falls Media's products and that its products have been featured in print publications like Details, Los Angeles Times, Maxim, Penguin Plume book catalogues, Rolling Stone, San Francisco Chronicle, Swing, and Tacoma City Paper, and on the television shows Oprah, The View, Live with Regis and Kelly, and The Tonight Show with Jay Leno. (Id. 89-90.) First, these efforts cannot counteract the undisputedly low sales and advertising figures. Second, the main point of considering advertising and promotional efforts - like all factors for secondary meaning - is to determine whether consumers identify a mark with its source, not its product. See Anti-Monopoly, 684 F.2d at 1319 ("[W]hen members of the consuming public use a game name to denote the game itself, and not its producer, the trademark is generic and, therefore, invalid."). The lion's share of Falls Media's evidence of promotional efforts does not demonstrate efforts to link the "Would you rather . . .?" mark with its source. Rather, the promotional efforts appear to be for the

purpose of selling copies of Falls Media's books, absent mention of the source of those books. See Birtcher Electro Medical Sys., Inc. v. Beacon Labs., Inc., 738 F. Supp. 417, 421 (D. Colo. 1980) (rejecting marketing efforts as probative of secondary meaning because the producer "failed to use the marks as trademarks"; the court "cannot infer that the consuming public associates the terms with [the producer] because of the extensive advertising when the advertising itself often failed to make the association.").[21] Nor, given the low sales figures, did Falls Media achieve what it set out to do: create a brand by selling copies of its books under the "Would you rather . . .?" mark that pointed to Falls Media as the source of the product. See International Jensen v. Metrosound U.S.A., Inc., 4 F.3d 819, 824 (9th Cir. 1993) ("While evidence of a manufacturer's sales, advertising, and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it."). In sum, no reasonable jury could conclude that Falls Media has created secondary meaning via its sales, advertising and promotional efforts.

Falls Media falls back on evidence that Zobmondo intentionally copied Falls Media's mark, but that still fails to create a genuine issue. It is undisputed that Zobmondo's founder, Horn, knew of Falls Media's books as early as 1997. (Trademark GI No. 51.) From 2000 to 2002, Hasbro distributed Zobmondo's game without the phrase "Would you rather . . .?" on the box because Falls Media had filed its

---

[21]Notably, Falls Media's evidence supporting these promotional efforts does not include any actual print advertisements or the text for any radio commercials, interviews, etc., so there is no evidence that its promotional efforts actually linked the "Would you rather . . .?" mark with its source, rather than its product.

registration for the mark. (Id. No. 54.) Zobmondo later attempted to buy Falls Media's mark. (Id. Nos. 58-59.) Horn received an email from his father discussing Horn's ability to gain control of the mark:

> Once they do not use the mark for a period of time you can move to have their control in the mark revoked and then you will be established as officially owning the mark. This sounds as if you have permission now and have a strategy for later to exclude others (including them) without paying a cent. What more could you ask? Dad.

(Id. No. 60.) Horn also told Hasbro that he would like to "seize control of this mark." (Id. No. 94.) Following these actions, Zobmondo released a new version of its game in late 2002 and early 2003, featuring "Would you rather . . .?" prominently on the box. (Id. No. 61.)

Even if the Court views this evidence in Falls Media's favor, it does not support Zobmondo's alleged intent to copy. First, none of this evidence directly proves that Zobmondo sought to copy Falls Media's mark, and it warrants no reasonable inference of intentional copying. The inference of secondary meaning based on proof of intentional copying rests on the assumption that the copier (here, Zobmondo) sought to capitalize on the goodwill of the holder of the mark. See PaperCutter, 900 F.2d at 564 ("Proof of intentional copying is often viewed as evidence of secondary meaning on the theory that the copying is motivated by a desire to benefit."). As discussed above, Falls Media had so little market goodwill that no rational jury could infer from this evidence that Zobmondo intended to capitalize on Falls Media's non-existent goodwill in the market. At most, the evidence points to the conclusion that Zobmondo intentionally used the "Would you rather . . .?" mark in a race to establish the mark for its own products before consumers associated it with Falls Media.

Finally, Falls Media offers 14 emails that it claims show actual consumer confusion. (Trademark GI No 92.) As Zobmondo points out, however, these emails do not necessarily evidence consumer confusion over competing products, but rather consumer confusion over the domain name www.wouldyourather.com. In other words, in most of these 14 instances, consumers have apparently emailed Falls Media at its wouldyourather.com web address with questions or comments related to Zobmondo's game, but few of them mention actually seeing Falls Media's product in the market or suggest confusion between the parties' products. See Lang v. Retirement Living Pub. Co., 949 F.2d 576, 582-83 (2d Cir. 1991) (rejecting 400 phone calls and several letters of actual confusion because "no evidence links the confusion evinced by the calls to any potential or actual effect on consumers' purchasing decisions" and noting that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally."). Moreover, several of these instances appear to arise from personal acquaintances of Heimberg and Gomberg, who were aware of Zobmondo's competing product and whose potential bias undermines their opinions. Cf. Filipino Yellow Pages, 198 F.3d at 1152 ("[T]estimony from persons closely associated with the plaintiff does not adequately reflect the views of the buying public." (citation omitted)). Finally, even if these 14 instances of actual confusion were probative of secondary meaning, they do not satisfy Falls Media's heavy evidentiary burden to establish secondary meaning, especially in light of Falls Media's failure to offer other probative evidence on this issue. See Woodsmith Pub. Co. v. Meredith Corp., 904 F.2d 1244, 1249 (8th Cir. 1990) (granting summary judgment despite "evidence of a few instances of actual confusion" among consumers).

The overriding consideration in secondary meaning is whether "the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." Ideal World Marketing, 15 F. Supp. 2d at 245. Although Zobmondo always bears the burden on summary judgment to establish no genuine issue of material fact, Falls Media bears the burden to prove secondary meaning at trial, which "entails vigorous evidentiary requirements." PaperCutter, 900 F.2d at 564. Even viewing the evidence in favor of Falls Media, Falls Media has not met this burden and no jury could find that it has created secondary meaning in the "Would you rather . . .?" mark such that the consuming public would link the "Would you rather . . .?" mark to Falls Media as the source of the products.[22]

3. Conclusion, Zobmondo's Counter-Claim for Cancellation, and Remaining Claims

Because the "Would you rather . . .?" mark is descriptive and Falls Media has failed to establish secondary meaning as a matter of law, the Court GRANTS summary judgment to Zobmondo on Falls Media's first claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1114, second claim for trademark infringement under 15 U.S.C. § 1125(a), and sixth claim for common law trademark infringement. Moreover, because the Court grants summary judgment to Zobmondo that the "Would you rather . . .?" mark is invalid, Zobmondo is also

---

[22]Zobmondo offers a survey and report by Dr. Henry D. Ostberg, in which Dr. Ostberg concludes that Falls Media has not acquired secondary meaning in the "Would you rather . . .?" mark. Falls Media fiercely attacks the reliability (and thus, relevance) of this survey. The Court need not resolve this dispute because, even absent this survey, Falls Media cannot defeat summary judgment on secondary meaning.

entitled to summary judgment on its second counterclaim for cancellation of Falls Media's federal Registration No. 2,970,830. See Gracie v. Gracie, 217 F.3d 1060, 1065-66 (9th Cir. 2000) (mandating cancellation of registration after jury concluded that mark was invalid). Falls Media has also pled its third claim for federal trademark dilution, 15 U.S.C. § 1125(c), fourth claim for common law trademark dilution, and fifth claim for unfair trade practices under New York law. These claims all depend on the validity of the "Would you rather . . .?" mark, so the Court GRANTS summary judgment as to each of them. Similarly, Zobmondo pleads its fourth and sixth counter-claims for unfair competition and trademark infringement, but acknowledged at oral argument that these claims cannot survive the Court's decision here. The Court DISMISSES those claims.

The Court notes, however, that Zobomondo's fifth counter-claim for damages based on fraud in the registration process remains and is not resolved by the Court's decision here.

**B. Falls Media's Motion for Summary Judgment on Zobmondo's Copyright and Trade Dress Infringement Claims**

Zobmondo claims that Falls Media's game infringes on its copyright for its game board from the 1998 version of its game and the copyright and trade dress of its game boxes from the 2002 "twisted, sick and wrong" version and the 2003 "game of wacky & mind-boggling questions" version. Falls Media has moved for summary judgment on all the claims in Zobmondo's complaint, which are trade dress infringement under section 43(a) of the Lanham Act, common law trade dress infringement, copyright infringement, and unfair competition.

1. Zobmondo Owns the Relevant Copyrights for Its Game Board and Game Boxes.

To prove copyright infringement, Zobmondo must demonstrate: (1) ownership of a valid copyright; and (2) copying of the original elements. See Rice v. Fox Broad. Co., 330 F.3d 1170, 1174 (9th Cir. 2003). Falls Media first challenges Zobmondo's ownership of the copyrights in the 1998 game board and the 2002 and 2003 game boxes. It is undisputed that Karl Sanders, a designer, created the 1998 game board artwork for Zobmondo and Jill Sanford-Burrows created the artwork for the game boxes at issue. On the game board copyright registration, Sanders is listed as Zobmondo's "employee," although Horn admits that Sanders was actually an "independent contractor." Sanders executed a purported "work for hire" agreement to cover the game board design. (Conf. Ghajar Decl., Ex. 3.) Similarly, Sanford-Burrows was retained under a "work for hire" "assignment" agreement, although the agreement does not indicate the exact work covered. (Id. Ex. 4.)[23]

Falls Media argues that these agreements constitute "work for hire" that is statutorily limited to various categories of work, and that, because the work created by Sanders and Sanford-Burrows does not fall within one of those categories, Zobmondo does not own the copyrights to this work. See 17 U.S.C. § 101. Zobmondo argues that, even if its agreements with Sanders and Sanford-Burrows cannot transfer copyrights as "work for hire" agreements, the agreements are valid assignments that the creators may have had in the works. The Court agrees with Zobmondo.

---

[23]Falls Media's objections to these documents are OVERRULED.

Setting aside the dubious proposition that Falls Media can even raise this issue here,[24] a valid assignment of copyrights under 17 U.S.C. § 204(a) requires "[n]o magic words"; "[r]ather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." Radio Tele. Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999). Both agreements executed by Sanders and Sanford-Burrows indicate that the work was to be "work for hire," with all copyrights vesting in Zobmondo, not in the creators. Since these agreements demonstrate that the parties intended for Zobmondo to own the copyrighted material at the outset, the parties must have intended that, even if the rights somehow vested in the creators, those rights would be immediately assigned to Zobmondo. This conclusion is further bolstered by the consistent positions of Zobmondo and the creators; not only did Sanders and Sanford-Burrows declare an intent to assign all their rights, they recently executed assignments to perfect Zobmondo's ownership of the copyrights. (See Sanders Decl., Ex. B; Sanford-Burrows Decl., Ex. B.) Of course, Falls Media attacks the validity of these new assignments, but the Court need not resolve that issue. The prior agreements demonstrate a clear intent that Zobmondo would own the copyrights to this work, and the parties who signed those agreements continue to maintain that position. See Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 592-93 (7th Cir. 2003) (rejecting challenge to assignment by non-party to the assignment because the contracting parties did not dispute the

---

[24] See, e.g., Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 592-93 (7th Cir. 2003) ("[W]here there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement.").

intent to assign rights). The Court concludes that Zobmondo owns the copyrights at issue here, and may therefore sue for infringement.

2. Falls Media's Game Board Does Not Infringe Zobmondo's Game Board Copyrights.

Because direct evidence of copying is often unavailable, copying can be established by proving "access" to the allegedly infringed work and substantial similarity between the works at issue. See Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir. 2000). The substantial similarity inquiry encompasses two tests: the "extrinsic test" and the "intrinsic test." See Smith v. Jackson, 84 F.3d 1213, 1219 (9th Cir. 1996). Substantial similarity under the extrinsic test "may often be decided as a matter of law." Sid & Marty Krofft Tele. Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir. 1977) ("Krofft"). The Court may not apply the intrinsic test on summary judgment since that inquiry is reserved for the trier of fact. See Shaw v. Lindheim, 919 F.2d 1353, 1358-61 (9th Cir. 1990). However, if the plaintiff cannot raise factual disputes under the extrinsic test, a court may find two works are not substantially similar and grant summary judgment, without applying the intrinsic test. See Funky Films, Inc. v. Time Warner Entm't Co., 462 F.3d 1072, 1077 (9th Cir. 2006); Kouf v. Walt Disney Pictures & Tele., 16 F.3d 1042, 1045 (9th Cir. 1994) ("[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests.").

Under the extrinsic test, the Court must consider whether two works share a similarity of ideas and expression as measured by external, objective criteria. See Apple Computer, Inc. v. Microsoft