O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SPIN MASTER, LTD., et al., | ) | Case Nos. CV 06-3459 ABC (PLAx) |
| | ) | CV 07-0571 ABC (PLAx) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER RE: MOTION FOR SUMMARY** |
| | ) | **JUDGMENT ON FRAUD COUNTERCLAIM** |
| ZOBMONDO ENTERTAINMENT, LLC, et | ) | |
| al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court is Plaintiffs Spin Master, Ltd., Justin Heimberg, and David Gomberg's (collectively "Spin Master's") motion for summary judgment on Defendants Zobmondo Entertainment, LLC and Randall Horn's (collectively "Zobmondo's") counterclaim for cancellation based on fraud on the Patent and Trademark Office ("PTO") pursuant to 15 U.S.C. § 1064(3), filed on January 24, 2011.  (Docket No. 269.)  Zobmondo opposed on January 31, 2011 and Spin Master replied on February 7, 2011.  The Court finds this matter appropriate for resolution without oral argument and VACATES the February 28, 2011 hearing date.  See Fed. R. Civ. Proc. 78; Local Rule 7-15.  For the reasons below, the Court GRANTS Spin Master's motion for summary judgment.

**PROCEDURAL BACKGROUND**

In these consolidated suits, the Court had granted summary judgment to Zobmondo on Spin Master's (formerly Falls Media, LLC's) claims of trademark infringement and unfair competition, finding that Spin Master's federally registered mark "Would You Rather . . .?" was descriptive and lacked secondary meaning.  On that same ground, the Court also granted summary judgment on Zobmondo's counterclaim for cancellation of the federal registration, U.S. Trademark Reg. No. 2,970,830.  After that decision, the Court granted summary judgment to Spin Master on Zobmondo's counterclaim for damages under 15 U.S.C. § 1120 for fraudulent procurement of a federal registration, finding only that Zobmondo failed to prove actual damages as a result of any fraud.  The Court did not decide whether any factual issue existed over whether fraud against the Patent and Trademark Office ("PTO") had, in fact, been committed.  (Docket No. 145[1].)  The Court then entered final judgment, which included, <u>inter alia</u>, dismissing as moot Zobmondo's counterclaim for cancellation under 15 U.S.C. § 1064 based on fraud on the PTO because the Court had already cancelled the registration based on descriptiveness.  (Docket No. 148 at 2.)

Spin Master appealed the Court's adverse summary judgment ruling and order of cancellation on descriptiveness grounds, and the Ninth Circuit reversed, concluding that the mark's character as descriptive and the mark's secondary meaning were matters of disputed fact not amenable to summary judgment.  <u>Zobmondo Entm't, LLC v. Falls Media, LLC</u>, 602 F.3d 1108, 1121 (9th Cir. 2010).  As a natural effect of that ruling, this Court's decision cancelling Spin Master's federal

---

[1] All references to Docket entries are for Case No. CV 06-3459 unless otherwise noted.

1  registration on descriptiveness grounds was also reversed.  Id. at

2  1112.  The Court previously ruled that the Ninth Circuit's decision

3  also revived Zobmondo's counterclaim for cancellation pursuant to §

4  1064(3) based on fraud on the PTO.  (Docket No. 265.)  This motion

5  seeks summary adjudication of Zobmondo's counterclaim before

6  proceeding to trial on Spin Master's claims of infringement.

7                          **FACTUAL BACKGROUND**[2]

8       The facts relevant to the disposition of this counterclaim are

9  undisputed, although the parties disagree as to their import.  As

10 explained by the Ninth Circuit, both Zobmondo and Falls Media use the

11 mark "Would you rather . . .?" to identify board games and books that

12 incorporate questions posing humorous, bizarre, or undesirable

13 choices.  Zobmondo, 602 F.3d at 1110.  Gomberg and Heimberg conceived

14 of the idea for a "Would you rather . . .?" board game in 1995 while

15 in college after Heimberg published a humor piece discussing funny

16 dilemmas.  (SUF 1—3; SAUF 94.)[3]  They contemporaneously recorded the

17 idea on a page of handwritten notes inside a notebook of other ideas;

18 based on those notes, the goal of the game would be to predict which

19 of two choices a player would select when presented with a dilemma.

20 (Gomberg Decl., Ex. 1 at 17.)  Likewise, Gomberg's notes from 1995

21 listed "Would you Rather" under a heading "Works in Progress" and

22

23 ───────────────

24        [2] The Court has reviewed the objections from the parties and
   OVERRULES them to the extent they are inconsistent with this opinion.
25 The Court GRANTS Zobmondo's unopposed request for judicial notice of
   Spin Master's PTO filings.  (Docket No. 285.)

26        [3] "SUF" refers to Spin Master's "Statement of Uncontroverted
   Facts," which also incorporates Zobmondo's responses and Spin Master's
27 replies to each one.  "SAUF" refers to Zobmondo's "Statement of
   Additional Uncontroverted Facts," which also incorporates Spin
28 Master's responses.

1    indicated that "This one could put us over the top. . . .  Think about
2    the format of the book, game/calendar possibilities." (Supp. Gomberg
3    Decl. ¶ 3, Ex. 1.)[4]

4        At first, Heimberg and Gomberg intended to license the game to a
5    game or toy company, rather than creating and manufacturing the game
6    themselves.  (SUF 4.)  Before seeking registration of the "Would you
7    rather . . .?" mark, Heimberg bought a "how-to" book on game making
8    (SUF 82) and, before November 1996, Gomberg printed a list of
9    "Manufacturers and Distributors" from the website www.gamecabinet.com
10   (SUF 83).  Before seeking registration of the mark in July 1997, they
11   discussed the game with a game agent, wrote questions that could be
12   used for the game play, prepared a package to give to their literary
13   agent,[5] and created the www.wouldyourather.com website.  (Ghajar
14   Decl., Ex. E (Heimberg Dep. Tr.) at 121:16—123:10, Ex. J (Mandel Dep.
15   Tr.) at 58:15—59:10; see also Heimberg Decl. ¶ 7.)

16       In 1995, Gomberg's father was a Senior Vice President at Western
17   Publishing Company, a prominent game distributor with titles such as
18   "Pictionary," "Outburst," and "Taboo." (SUF 13.)  Although Western's
19   Golden Games division had been acquired by Hasbro in 1994, Gomberg and
20   Heimberg hoped they could use Gomberg's father's contacts to promote
21   their game concept, and, in fact, he gave them several toy industry
22   contacts in September 1995.  (Id.)  From November 1995 through

23

24       [4] This document was uncovered after Zobmondo filed its opposition
     to this motion.  (Supp. Gomberg Decl. ¶ 3.)  Spin Master produced this
     document to Zobmondo just one day before filing its reply brief, but
25   it appears that Heimberg was deposed after the document's discovery
     and Zobmondo has not objected to Spin Master's filing, so the Court
26   does not see any unfairness in considering it.

27       [5] Their literary agent Jay Mandel testified that he did not offer
     his services to represent the game, but he confirmed that Gomberg came
28   to him with the idea as early as 1996.  (SAUF 132.)

December 1999, Gomberg himself worked for a company called Nextoy in developing original game and toy concepts and believed that licensing the "Would you rather . . .?" game was preferable to manufacturing the game themselves.  (SUF 6.)  Although he could not remember exact dates, while at Nextoy between 1995 and 1999, he pitched the "Would you rather . . .?" game concept to "everyone from Mattel to Hasbro to Spin Master to Pressman to smaller toy companies"; in Gomberg's words, Gomberg and Nextoy's owner Robert Fuhrer met with "every major toy company in the world, basically." (Ghajar Decl., Ex. F (Gomberg Dep. Tr.) at 244:20—245:4, 246:6—12.)  Of all those pitches, however, Gomberg could only specifically recall speaking with representatives from Hasbro in 1998.  (Korn Decl., Ex. B (Gomberg Dep. Tr.) at 203:1—205:10.)

On July 31, 1997, Heimberg and Gomberg filed an "intent-to-use" ("ITU") application with the PTO indicating that they intended to use the mark "Would you rather . . .?" on two product categories: books and games.  Zobmondo, 602 F.3d at 1111.  As part of that application, Heimberg and Gomberg swore that they had a "bona fide intention to use the trademark in commerce on or in connection with the specified goods."  (Korn Decl., Ex. A at 5.)

In September 1997, they began selling books at retail containing the "Would you rather . . .?" mark and premise.  (SUF 11.)  In the summer or fall of 1997, Heimberg and Gomberg also pitched to several production companies an idea for a television game show based on the "Would you rather . . .?" concept, which, according to them, could lead to development and sales of a board game.  (SUF 14, 15.)  Heimberg believed that the questions and rules developed for the game show could help develop the board game, although there are no

documents from that period to indicate that Heimberg and Gomberg were actively trying to adapt the game show elements to the medium of a board game.  (SUF 17, SAUF 103.)  In February 1998, Paramount bought an option to develop, produce, and sell the "Would you rather . . .?" game show, but the option was never exercised.  (SUF 18.)  The pitch materials indicated that Heimberg and Gomberg were "exploring board game possibilities as well . . . ."  (Conf. Heimberg Decl. ¶ 6, Ex. B at 33.)

On the game front, in a November 1, 1997 letter from Heimberg to Gomberg about the potential content for the "Would you rather . . .?" website, Heimberg stated, "Let's get our games sold."  (SUF 16.) Nevertheless, Heimberg and Gomberg did not take further action developing the board game until September 1999, when Heimberg and Gomberg developed the rules of play, based on the existing game "Scruples" and Zobmondo's similar game called "Zobmondo!! That Crazy 'Would You Rather' Game" and "Zobmondo!! The Outrageous Game of Bizarre Choices" (neither of which yet prominently featured the "Would you rather . . .?" mark on the packaging),[6] in an effort to secure an option agreement with Pressman Toys.  (SUF 22; SAUF 104, 105.) Pressman Toys optioned the game in October 5, 1999 for one month for $1,000, but let the option expire without exercising it.  (SUF 23, 24.)

After Gomberg left Nextoy in 1999, Nextoy's owner Fuhrer discussed the "Would you rather . . .?" game with Hasbro and Mattel in early 2000.  (SUF 26; SAUF 108.)[7]  Fuhrer first contacted Mike Hirtle

---

[6] See Zobmondo, 602 F.3d at 1112.

[7] Gomberg left Nextoy in November 1999 to work for a company
(continued...)

at Hasbro and informed him of Gomberg and Heimberg's rights in the trademark "Would you rather . . .?" in an effort to secure a license from Hasbro if it used the term for Zobmondo's similar game. (SAUF 109.) Hasbro did not take a license, but it did not use the phrase "Would you rather . . .?" on the Zobmondo game. (Korn Decl., Ex. D (Fuhrer Dep. Tr.) at 149:18—23.)

In contrast, Mattel was "very interested" in the concept, so, in February 2000, Nextoy sent Mattel a letter promoting the "Would you rather . . .?" board game and describing the concept, objectives, components, and game play. (SUF 27.) On the same day, Heimberg sent Gomberg an email stating, "Let's do what we can to make this board game. We will then have succeeded in our original endeavor." (Id.) Nextoy created and sent a "prototype" of the game to Mattel, which consisted of a plain white box, a simple game board, questions, and playing pieces. (SUF 29; SAUF 110.) Mattel held the prototype until October 2001, at which point it passed on the game. (SUF 36; SAUF 110.) During the time Mattel had the prototype, Heimberg, Gomberg, and Fuhrer did not take any additional steps to develop or license the game; at most, Heimberg and Gomberg had meetings with production companies about a possible game show. (SUF 33; SAUF 112, 113, 114.) In fact, in a May 2000 email, Heimberg and Gomberg called their prospects for licensing the game "dubious." (SAUF 116.) And Fuhrer testified that he stopped pitching the game after Mattel returned the

---

[7](...continued)
called Bunk1 that provided summer camp services. (SAUF 106.) At that time, Heimberg lived in Los Angeles working for a non-profit organization and pursuing a screenwriting career. (SAUF 107.)

1  prototype in October 2001.  (Korn Decl., Ex. D (Fuhrer Dep. Tr.) at

2  216:9—12.)[8]

3      While these licensing efforts were underway, Zobmondo filed an

4  opposition proceeding in October 1999 against Heimberg and Gomberg's

5  application to register the "Would you rather . . .?" mark.  (SUF 25.)

6  In the spring of 2000, Heimberg met with Randall Horn of Zobmondo and

7  told him that they were moving forward with the board game; Heimberg

8  and Gomberg even suggested between the two of them that they might

9  work with Zobmondo.  (SUF 31, 32.)  That never happened.  In any case,

10 Zobmondo's opposition was dismissed on November 19, 2001 for its

11 failure to respond to the Trademark Trial and Appeal Board's

12 ("TTAB's") order to show cause why a brief had not been filed.  (SUF

13 25.)

14     On January 8, 2002, the PTO issued a Notice of Allowance for

15 Heimberg and Gomberg's Trademark Application No. 75/333,978.  (SUF

16 38.)  Likewise, in 2002, Heimberg and Gomberg began to realize that

17 licensing was an increasingly remote possibility, so they began

18 discussing the possibility of manufacturing the game themselves; they

19 also continued to write new questions, admittedly not specifically for

20 use in a game, but some of which ended up in the game anyway.  (SUF

21 39; SAUF 118.)  Heimberg called Fuhrer sometime in 2002 to ask about

22 manufacturers in China.  (Korn Decl., Ex. D (Fuhrer Dep. Tr.) at

23 165:5—19.)  Heimberg also met with Horn in the spring of 2002 to once

24 again discuss licensing the "Would you rather . . .?" mark to

25 _____

26     [8] In August 2001, Penguin, the publisher of Heimberg's and
   Gomberg's "Would you rather . . .?" books, also sent a letter to
   Lagoon games instructing it to stop selling a board game using the
27 "Would you rather . . .?" mark, although that letter did not refer to
   Heimberg and Gomberg's use of the mark on a board game of their own.
28 (SUF 35.)

Zobmondo.  (SUF 42.)  Also, in April 2002, Gomberg spoke with someone from a company called Winning Moves "about what goes into making a game."  (Supp. Gomberg Decl., Ex. 3.)

On July 2, 2002, Heimberg and Gomberg requested their first extension of time to file their statement of use.  (SUF 43.)  At that time, they were prepared to file a statement of use of the mark on books, but did not do so because they also wanted to perfect their rights with regard to games and file the statement of use for both categories of goods simultaneously.  (SUF 43.)

Later in 2002, Heimberg and Gomberg began planning to manufacture the game themselves and in November 2002, they contacted Fuhrer about shifting from a licensing business model to a manufacturing model.  (SUF 44, 45.)  Gomberg also contacted freelance designer Berk Kent in late 2002 about designing a game for them and they brainstormed at that time about colors and design.  (SUF 46, 47.)

On January 6, 2003, Heimberg and Gomberg filed their second request for an extension of time to file a statement of use.  (SUF 48.)  To obtain that extension, Heimberg and Gomberg needed to attest to "good cause" for the additional time, which they indicated was "in view of delays in marketing arrangements."  (Korn Decl., Ex. H.) Gomberg explained that, from his perspective, the "delays in marketing arrangements" referred to Fuhrer's inability to find a company interested in licensing the game.  (Korn Decl., Ex. B (Gomberg Dep. Tr.) at 345:1—7 ("As of January 6, 2003, we had not been able to get our game to market because Bob Fuhrer was not able to find a company interested in licensing it.").)

From January through June 2003, Berk Kent worked on designing a board game and it eventually took him only ten hours to develop a

final draft of the game.  (SUF 49; SAUF 131.)  Also during that period, Heimberg and Gomberg emailed requests for price quotes for the manufacture of a "small quantity" (250—500) of a "card-based" game without a board and with rules printed on the box.  (Conf. Gomberg Decl., Exs. 6, 7.)  These emails were sent one day after Heimberg and Gomberg filed their the second extension and Gomberg candidly admitted at his deposition that the timing of their email requests may have had something to do with the fact that they had just filed for another extension.  (Korn Decl., Ex. B (Gomberg Dep. Tr.) at 347:9—13.)

They also actively worked on developing questions, rules, game format, and board design for a "Would you rather . . .?" board game.  (SUF 51.)  In fact, on May 1, 2003, Heimberg sent an email to Horn after seeing a new version of Zobmondo's board game in stores that used the phrase "Would you rather . . .?" and told Horn that he and Gomberg "have always planned to release a WOULD YOU RATHER . . .? game" and that the game was "in the final stages of development and will be finished in the next few months."  (Conf. Heimberg Decl., Ex. M.)

Heimberg and Gomberg sought additional extensions from the PTO on June 18, 2003 (SUF 57), December 8, 2003 (SUF 61), and June 15, 2004 (SUF 69).  It is undisputed that during this time Heimberg and Gomberg were pursuing the manufacturing of a board game by seeking price quotes from manufacturers; by finalizing the game design, packaging game play, and content; by receiving the final shipped product; and by selling the game in commerce.  (SUF 51—53, 56, 59, 60, 62, 64—68, 70, 74, 75.)[5]  In light of the looming January 8, 2005 expiration of the

---

[5] Heimberg and Gomberg formed Falls Media LLC in October 2004.
(continued...)

10

ITU application, Gomberg wrote in a June 30, 2004 email that he had talked with a lawyer, who "stressed that there needs to be interstate commerce, not just us giving a few copies to friends" and if they "miss[ed] the jan [sic] 8 deadline, randy horn [sic] gets priority on the trademark in the event we try to re-apply." (Conf. Korn Decl., Ex. G.)  One day earlier, Heimberg wrote in an email regarding design for the cards used in the board game that the game design "needs to be our priority, now, or we will lose the whole WYR brand to Randy Horn" and that they had a "huge brand to develop here which will be awesome and lead to bigger things.  Let's get moving!" (Conf. Korn Decl., Ex. H.)  Consistent with the desire to get the game sold in commerce, Heimberg and Gomberg created a "December Plan of Action For Would You Rather" that indicated they needed to get "500—1000 units sold over the web or in stores by Jan 8, pref. Jan 1" and they would "[k]eep records of evidence of interstate shipping," and listed stores where 128 units were already placed for sale.  (Conf. Korn Decl., Ex. I.)  In an effort to get the game sold, in October 2004 Heimberg and Gomberg sold 36 units to several variety stores in New York and New Jersey, which were owned by Gomberg's father-in-law (SAUF 126), and sold units to other retailers (Korn Decl., Ex. B (Gomberg Dep. Tr.) at 317:9—25).  They also offered retailers a discounted price for the month of December 2004.  (Conf. Korn Decl., Ex. K.)

On November 29, 2004, Heimberg and Gomberg filed their statement of use verifying that the "Would you rather . . .?" mark had been used in commerce on books, board games, and comics.  (SUF 76.)  In a December 14, 2004 email, they urged friends to buy copies of the game,

---

[5](...continued)
(SUF 73.)

explaining that they had "done all [they were] supposed to do to properly register and use the mark," but, in order to "arm" them "with the most ammunition possible to get them [apparently meaning Zobmondo] to stop" using the "Would you rather . . .?" mark, they "need[ed] to demonstrate as much interstate commerce for our game by the end of the year." (Conf. Korn Decl., Ex. J.)

The statement of use was approved by the PTO on June 11, 2005 (SUF 77), and the registration issued on July 19, 2005 (SUF 78).

## LEGAL STANDARD

Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing on the essential elements of its claims on which it bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). An issue of fact is genuine if it reasonably can be resolved in favor of either party. Anderson, 477 U.S. at 250-51. The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. Id. at 255. But "mere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989).

**DISCUSSION**

**A.  Fraud and the "Intent to Use" System**

This case arises at the intersection of two parts of trademark law: the statutory "intent to use" system and the bar against fraud on the PTO in the registration process.  The "intent to use" registration system allows an applicant to seek registration without using a mark in commerce, so long as the applicant has "a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce."  15 U.S.C. § 1051(b)(1).  Once a "notice of allowance" for the mark is issued, the applicant has six months to use the mark in commerce.  Id. § 1051(d)(1).  The applicant may seek an initial six-month extension, and, upon a showing of "good cause," may seek up to four additional six-month extensions.  Id. § 1051(d)(2).  As a result of these provisions, an applicant has up to three years after the notice of allowance to use the mark in commerce, provided that, during that period, the applicant maintains the bona fide intent to use the mark in commerce.  Id.

The Senate Report on the 1988 amendments that created the "intent to use" system explained that the "bona fide" intent to use a mark in commerce was intended to be measured by objective factors.  S. Rep. No. 100-515, at *8 (1988); see also Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc., 525 F.3d 8, 21 (D.C. Cir. 2008) (explaining that "bona fide" intent includes "both actual intent to use a mark in commerce and evidence, contemporary with the application, that objectively demonstrate such an intent.").  This may be satisfied by a statement of intent to use a mark on identified products in the future, even if the applicant has not taken concrete steps to create and introduce a new product, provided that the applicant intends to

use the mark as claimed.  S. Rep. No. 100-515, at *8.  For extensions, there may be doubt as to the bona fide intent to use the mark if concrete steps have not been taken to use the mark in commerce.  Id. at *11.  The Senate Report noted that only the "rare applicant" would make use of all possible extensions, id. at *18, although Spin Master offered undisputed evidence that, as of 2008, almost 15,000 registrations had been issued after the maximum number of extensions was granted (SUF 90).

The lack of bona fide intent must normally be proved by a preponderance of the evidence; that burden can be carried by pointing to a complete absence of any contemporaneous documents reflecting that intent at the time of the application.  See Saul Zaentz Co. v. Bumb, 95 U.S.P.Q.2d 1723, 1727 (T.T.A.B. 2010); see also Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha Opp., 26 U.S.P.Q.2d 1503, 1507 (T.T.A.B. 1993).  The burden then shifts to the applicant to rebut the prima facie case "'by offering additional evidence concerning the factual circumstances bearing upon its intent to use its mark in commerce.'"  Saul Zaentz, 95 U.S.P.Q.2d at 1727.  An applicant cannot rebut the prima facie case merely by pointing to a statement of subjective intent to use a mark in commerce.  See Lane Ltd. v. Jackson Int'l Trading Co., 33 U.S.P.Q.2d 1351, 1355 (T.T.A.B. 1994).

When dealing with a cancellation claim based on fraud, however, a "bona fide" intent to use a mark in commerce is only one aspect of the fraud claim.  Pursuant to 15 U.S.C. § 1119, the Court has authority to cancel the federal registration of a trademark.  One ground for cancellation is that the registration "was obtained fraudulently."  15 U.S.C. § 1064(3).  In order to prove fraud on the PTO, the party seeking cancellation must show: "a false representation regarding a

14

material fact, the registrant's knowledge or belief that the
representation is false, the intent to induce reliance upon the
misrepresentation and reasonable reliance thereon, and damages
proximately resulting from the reliance." Robi v. Five Platters,
Inc., 918 F.2d 1439, 1444 (9th Cir. 1990); see also eCash Techs., Inc.
v. Guagliardo, 127 F. Supp. 2d 1069, 1079 (C.D. Cal. 2000), aff'd mem.
on other grounds, 35 Fed. App'x 498 (9th Cir. 2002).[6]  The burden to
prove fraud is "heavy," Robi, 918 F.2d at 1439, and must be shown by
clear and convincing evidence, In re Bose Corp., 580 F.3d 1240, 1243
(Fed. Cir. 2009).  "Indeed, 'the very nature of the charge of fraud
requires that it be proven "to the hilt" with clear and convincing
evidence.  There is no room for speculation, inference or surmise and,
obviously, any doubt must be resolved against the charging party.'"
Id.

    The Federal Circuit has made clear that the falsity and intent
prongs are separate, so "absent the requisite intent to mislead the
PTO, even a material misrepresentation would not qualify as fraud
under the Lanham Act warranting cancellation." Id.  "[D]eception must
be willful to constitute fraud," id., and "[m]ere negligence is not
sufficient to infer fraud or dishonesty," id. at 1244.  As a result,
"[s]ubjective intent to deceive, however difficult it may be to prove,
is an indispensable element in the analysis." Id. at 1245.  While
intent to deceive may be inferred from circumstantial evidence, "'such
evidence must still be clear and convincing, and inferences drawn from
lesser evidence cannot satisfy the deceptive intent requirement.'"
Id.  Thus, "[w]hen drawing an inference of intent, 'the involved

---

[6] Here, the parties only dispute the falsity and intent to
deceive prongs.

1  conduct, viewed in light of all the evidence . . . must indicate

2  sufficient culpability to require a finding of intent to deceive.'"

3  Id. (ellipsis in original).[7]

4  **B.  Zobmondo's Claims of Fraud on the PTO**

5       Zobmondo spends substantial time in its opposition arguing that

6  Heimberg and Gomberg lacked the "bona fide" intent to use the "Would

7  you rather . . .?" mark for board games, as required by the Lanham

8  Act.  Those arguments, however, address only the falsity prong of

9  fraud; they do not demonstrate the clear and convincing evidence

10  necessary to prove subjective intent to deceive the PTO, which the

11  court in Bose made clear is "indispensible" to any fraud cancellation

12  claim.  See Bose, 580 F.3d at 1245.  Because "the lack of a good faith

13  intent to use a mark does not equate to bad faith," SmithKline Beecham

14  Corp. v. Omnisource DDS, LLC, 97 U.S.P.Q.2d 1300, 1305 (T.T.A.B.

15  2010), in order to survive summary judgment, Zobmondo must offer clear

16  and convincing evidence that would compel a jury to infer that

17  Heimberg and Gomberg subjectively intended to deceive the PTO.  It is

18  clear that Zobmondo cannot do so.

19       Through its briefing, Zobmondo has made clear that it is pursuing

20  fraud claims only as to Heimberg and Gomberg's initial ITU application

21  and their first two extensions of time.  (Opp'n 3.)  Indeed, the

22  undisputed evidence makes pellucid that, as of the third extension

23  sought in June 2003 and through issuance of the registration, Heimberg

24  and Gomberg had taken significant concrete steps to manufacture and

25  sell a board game themselves (such as by seeking price quotes from

26

27       [7] The parties dispute whether Zobmondo's fraud cancellation
counterclaim is equitable and would be tried to the Court, rather than
28  to the jury.  Because the Court grants summary judgment to Spin
Master, the Court need not decide the issue.

manufacturers; finalizing the game design, packaging, game play, and
content; receiving the final shipped product; and selling the game in
stores), which defeats any subjective intent to deceive the PTO.
Thus, the Court addresses only the intent to deceive for the initial
ITU application in 1997 and the first two extensions obtained in July
2002 and January 2003.

### 1. 1997 ITU Application

Heimberg and Gomberg offered several pieces of undisputed
documentary evidence of their intent to use the "Would you rather . .
.?" mark on a board game at or near the time of their filing of the
ITU application, which was to be part of an overall strategy to create
a "Would you rather . . .?" line of products that would include books,
games, and even a television game show.  For example, there was a set
of notes from 1995 sketching out the idea for the game concept and
game play and notes from 1995 mentioning the possibility of "Would you
rather . . .?" branded products, including a game.  Heimberg also
bought a "how-to" book on game making and Gomberg printed a list of
"Manufacturers and Distributors" from the website www.gamecabinet.com.
They also discussed the game with a game agent, wrote questions that
could be used for game play, prepared a package to give to their
literary agent, and created the www.wouldyourather.com website.  All
of this undisputed evidence demonstrates that they were pursuing the
creation of a board game, not subjectively intending to deceive the
PTO into believing they were pursuing a game when they really were
not.

Zobmondo cites a series of TTAB cases to argue that this evidence
shows only a "vague plan for, or conception of" a board game, which is
insufficient to demonstrate a bona fide intent to use the "Would you

rather . . .?" mark on games in 1997.  See, e.g., SmithKline, 97 U.S.P.Q.2d at 1304; Saul Saentz, 95 U.S.P.Q.2d at 1729—30; Honda Motor Co. v. Winkelmann, 90 U.S.P.Q.2d 1660, 1664 (T.T.A.B. 2009); L.C. Licensing Inc. v. Berman, 86 U.S.P.Q.2d 1883, 1891—92 (T.T.A.B. 2008). However, those cases are distinguishable because they all were decided in the context of an opposition to registration based on a lack of bona fide intent to use the marks in commerce, not in the context of fraud allegations, as in this case, which requires clear and convincing evidence of subjective intent to deceive.

Moreover, in each of those cases, unlike this case, there was a complete dearth of contemporaneous documentary evidence demonstrating bona fide intent.  In SmithKline, for example, the TTAB sustained an opposition to an ITU application for the mark "AQUAJETT" on oral irrigators, finding a lack of bona fide intent because the only contemporaneous documents of intent identified by the applicant were minutes from an annual board meeting and patent registrations that did not mention the mark or the goods identified by the mark.  97 U.S.P.Q.2d at 1305.  Likewise, in Saul Saentz, the TTAB sustained an opposition to an ITU application for the mark "MITHRIL"[8] on various types of jewelry, finding a lack of bona fide intent to use the mark based not only on the lack of any contemporaneous documents, but also on the applicant's admissions that he had no specific plans to develop and sell any of the products identified in the application.  95 U.S.P.Q.2d at 1728—29.  Honda and L.C. Licensing also dealt with similar circumstances.  See Honda, 90 U.S.P.Q.2d at 1663—64; L.C.

_____

[8] "MITHRIL" is a reference to a mythical precious metal in J.R.R. Tolkien's Lord of the Rings novels.  Saul Saentz, 95 U.S.P.Q.2d at 1726.

Licensing, 86 U.S.P.Q.2d at 1891—92.  Unlike these cases, there is
undisputed documentary evidence showing that, before applying for
registration in July 1997, Gomberg and Heimberg were planning to
develop a board game bearing the "Would you rather . . .?" mark.

Moreover, even if this evidence were insufficient alone to defeat
Zobmondo's fraud claim, because the subjective intent to deceive must
be considered in "in light of all the evidence," Bose, 580 F.3d at
1245, the Court may consider evidence arising after the application in
determining intent, so long as it is "sufficiently contemporaneous" to
the application filing date, Lane, 33 U.S.P.Q.2d at 1356 (finding
correspondence created up to eleven months after ITU application
showed bona fide intent at time of application).  In a November 1997
email, Heimberg urged Gomberg to "get our games sold," demonstrating
an intent to in fact pursue a "Would you rather . . .?" game a mere
five months after the July 1997 ITU application.  Also, given the
strategy to develop a "Would you rather . . .?" brand, it is
significant that they successfully launched their "Would you rather .
. .?" book in September 1997 and were pitching the "Would you rather .
. .?" game show idea to production companies throughout 1997
(culminating in an option from Paramount), which they undisputedly
believed would help with both the content and success of a board game.
In fact, in the game show pitch materials provided to Paramount only
eight months after the ITU application, they indicated that they were
"exploring board game possibilities as well" as the game show.

Gomberg also testified without contradiction that, during this
time, he and Heimberg intended to use his father's industry contacts
to license their game, and that, while he worked for Nextoy, he spoke
with representatives from many companies about the game, although he

1  could only remember his conversation with Hasbro sometime in 1998.

2  While there is no indication of when in 1998 this conversation took

3  place, even assuming it took place at the very end of 1998, it still

4  undermines the claim that they subjectively intended to mislead the

5  PTO in their ITU application.  See Lane, 33 U.S.P.Q.2d at 1356.[9]

6      In light of the undisputed documentary evidence surrounding the

7  1997 ITU application, no reasonable jury could find by clear and

8  convincing evidence that Heimberg and Gomberg subjectively intended to

9  deceive the PTO about developing a game with the "Would you rather . .

10 .?" mark.

11      2.    Activities Between 1999 and the 2002 Notice of

12            Allowance

13      Even though Heimberg and Gomberg were not required to further

14 renew their statement of bona fide intent to use the "Would you rather

15 . . .?" mark on board games while their ITU application was published

16 for opposition before the 2002 Notice of Allowance, Zobmondo

17 nevertheless attacks their intent during this time.  But once again,

18 the undisputed evidence demonstrates that, while they might have moved

19 at a snail's pace during this time and may even have functioned under

20 a misunderstanding with their game agent, no reasonable jury could

21 find clear and convincing evidence of a subjective intent to deceive

22 the PTO.

23

24 _____

      [9]Heimberg and Gomberg rely on the TTAB's non-precedential
25 decision in Blair Corp. v. Fassinger, 2008 TTAB LEXIS 581, at *4—14
   (T.T.A.B. Oct. 17, 2008), in which the Board found bona fide intent to
26 use a mark in commerce based on the applicant's strategy of creating a
   series of books bearing the applied-for mark and then using the mark
27 on other goods listed in the ITU application.  While factually similar
   to Heimberg and Gomberg's efforts here, the Court has not relied on
28 this non-precedential decision in rejecting Zobmondo's contentions.

For example, in September 1999, Heimberg and Gomberg developed the rules of play for the board game, based on the existing game "Scruples" and Zobmondo's game, which helped secure a one-month option with Pressman toys.  Zobmondo complains that this was "more than two years after the ITU Application was filed" (Opp'n 16), but, as explained above, other facts indicate that Heimberg and Gomberg were moving forward with the game (albeit slowly) up to that point, and an option like this was a goal of those efforts.  When Pressman passed on its option, Fuhrer contacted Hasbro in early 2000 about licensing the "Would you rather . . .?" mark on Zobmondo's game.  Hasbro rejected the license but did not use the mark.  Fuhrer then contacted Mattel, which was "very interested."  He provided Mattel a prototype in February 2000, which Mattel did not return until October 2001.

Zobmondo attacks the lack of activity during the twenty months Mattel had the prototype, but given the undisputed importance of a license to a "large toy company" like Mattel (SUF 30), it was not unusual that Heimberg and Gomberg would not contact other potential licensees while Mattel considered licensing their game.  Nevertheless, it is undisputed that, during the time Mattel had the prototype, Heimberg was pushing forward with the "Would you rather . . .?" game show.  Although Heimberg approached Horn during this time about partnering with Zobmondo in part because their licensing leads seemed "dubious," mere doubt about the prospect of licensing to Mattel does not demonstrate an affirmative intent not to create a game at all. This evidence does not raise a triable issue of fact of a subjective intent to deceive the PTO about their plans to use the "Would you rather . . .?" mark on a board game.

1    Zobmondo's arguments about the delay during this time are

2    somewhat disingenuous, given that it filed an opposition in October

3    1999 and did not act on it, resulting in its dismissal over two years

4    later in November 2001.  Heimberg and Gomberg could have reasonably

5    chosen to move cautiously during this period of opposition when there

6    existed at least some uncertainty about whether the notice of

7    allowance would issue.  See Eastman Kodak Co. v. Bell & Howell

8    Document Mgmt. Prods. Co., 994 F.2d 1569, 1572 (Fed. Cir. 1993)

9    ("'Subjecting an intent-to-use application to the opposition process

10   before the applicant makes use of its mark is essential if the system

11   is to achieve its goal of reducing uncertainty before the applicant

12   invests in commercial use of the mark.'" (quoting Senate Report on

13   1988 amendments)).

14          3.   Activities Between January 2002 Notice of Allowance and

15               July 2002 Extension

16   Zobmondo attacks Heimberg's and Gomberg's efforts (or lack of

17   effort) between the issuance of the Notice of Allowance in January

18   2002 and the request for the first extension in July 2002 by citing

19   allegedly conflicting testimony from Gomberg and Fuhrer about who was

20   pitching the "Would you rather . . .?" game and when.  Gomberg

21   testified that he was relying on Fuhrer to pitch the game in 2002

22   (SAUF 119), while Fuhrer testified that after Mattel passed on the

23   game in October 2001, he stopped pitching it (SAUF 117).  On this

24   basis, Zobmondo argues that, during this time, "[t]he entire team

25   points the finger at [one] another as if to say, 'he was supposed to

26   do it,' and in reality, no one was doing anything in a genuine effort

27   to license or manufacture a board game." (Opp'n 20.)  But Heimberg

28   and Gomberg's mistaken understanding of their relationship with Fuhrer

at most amounts to negligence, which is insufficient to support an inference of a subjective intent to deceive the PTO.  Bose, 580 F.3d at 1244.

Even beyond this misunderstanding, there was some undisputed evidence that Heimberg and Gomberg were, in fact, moving forward with the board game during 2002.  They continued writing new questions, not specifically for the game, but some of which were used in the game. Heimberg called Fuhrer in 2002 to ask about manufacturers in China and met with Horn in the spring of 2002 to once again discuss licensing the "Would you rather . . .?" mark to Zobmondo.  And in April 2002, Gomberg spoke with someone from Winning Moves "about what goes into making a game."  No reasonable factfinder could conclude that this is clear and convincing evidence of a subjective intent to deceive the PTO leading up to the first extension in July 2002.

### 4.   July 2002 and January 2003 Extensions

During the time between the first extension in July 2002 and the second extension in January 2003, Heimberg and Gomberg were continuing efforts to create a "Would you rather . . .?" board game.  For example, they contacted Fuhrer in November 2002 about shifting from a licensing business model to a manufacturing model.  Around the same time, Gomberg contacted freelance designer Berk Kent about designing a game for them and they brainstormed about colors and design.  Starting in January 2003,[10] Berk Kent worked on designing a board game and Heimberg and Gomberg sought quotes for the manufacture of a "small

---

[10]Again, evidence of bona fide intent arising shortly after an ITU application or request for extension can be probative of intent at the time of the application or extension.  Lane, 33 U.S.P.Q.2d at 1356 (finding evidence probative even though arising up to eleven months after application).

quantity" of a "card-based" game without a board and with rules printed on the box.[11]   They also actively worked on developing questions, rules, game format, and board design for a "Would you rather . . .?" board game.   And in May 2003, Heimberg wrote Horn after seeing a new version of Zobmondo's board game in stores that used the phrase "Would you rather . . .?" and told Horn that he and Gomberg "have always planned to release a WOULD YOU RATHER . . .? game" and that the game was "in the final stages of development."   All of this undisputed evidence defeats any inference of a subjective intent to deceive the PTO.[12]

Zobmondo once again attempts to manufacture a factual dispute that good cause for the second extension was lacking by pointing to the alleged misunderstanding between Fuhrer and Gomberg that the "delays in marketing arrangements" claimed as "good cause" for further

---

[11] Although Gomberg candidly admitted at his deposition that the emails seeking manufacturing quotes may have had something to do with the fact that they had just requested another extension, a jury could easily infer from this testimony that the slow pace of shifting to the manufacturing model necessitated the extension, not that the extension prompted the efforts to undertake manufacturing.   Heimberg's equivocal testimony is not the kind of evidence that "must indicate sufficient culpability to require a finding of intent to deceive," Bose, 580 F.3d at 1245, so it does not defeat summary judgment.

[12] Zobmondo argues that the quotes Heimberg and Gomberg sought for manufacturing the game in January 2003 were suspect because they described a card-based game and that Kent Burk's efforts were suspect because he only spent ten hours in designing the game.   (Opp'n 23—24.) Even if the steps to manufacture the game fell short of what Zobmondo would have done, the fact is that they were still steps, inconsistent with a subjective intent to deceive the PTO.   Indeed, an equally plausible explanation for the limited scale of Heimberg and Gomberg's efforts may have been to conserve costs since they were shifting from a license-based model (where someone else would pay for the costs of manufacturing) to a manufacturing-based model (where they would pay these costs themselves).   This evidence certainly does not compel an inference of subjective intent to deceive as required by Bose.

extensions were based on Fuhrer's inability to secure a license for
the game, even though Fuhrer stopped pitching the game after Mattel
returned the prototype in October 2001.  However, Gomberg's testimony
on this point was not necessarily inconsistent with Fuhrer's
statement.  (See Korn Decl., Ex. B (Gomberg Dep. Tr.) at 345:1—4 ("As
of January 6, 2003, we had not been able to get our game to market
because Bob Fuhrer was not able to find a company interested in
licensing it.").)[13]  And the other undisputed evidence shows that
Heimberg and Gomberg were, in fact, taking steps to shift to
manufacturing the game themselves as of January 2003.  Because this
evidence does not approach the clear and convincing threshold to
compel an inference of intent to deceive, it does not create a
disputed fact sufficient to defeat summary judgment.

　　　　　　5.　　Intent to Defraud Starting in June 2003

As noted above, Zobmondo does not challenge that Heimberg and
Gomberg had a bona fide intent to use the mark on games beginning with
their third request for extension in June 2003 and through the
issuance of the registration.  Nevertheless, Zobmondo argues that
evidence near the time of their statement of use in November 2004,
particularly the circumstances surrounding their marketing and sales
of the game they eventually manufactured, demonstrates that they
intended to "squat on the mark" when they filed their application over
five years prior in 1997.  Yet, this evidence is far too attenuated to

---

[13] The Court rejected this same argument in denying attorney's
fees to Zobmondo.  (Docket No. 209 at 3 (finding that this testimony
"could just as easily be referring to actions of the agent leading up
to January 6, 2003, i.e., actions in 2000, 2001, 2002, as compared to
— as Zobmondo would have it — alleged actions of the agent on January
6, 2003," which was "hardly definitive proof that Gomberg intended to
defraud the patent office by stating that delays in marketing
arrangements necessitated an extension.").)

be clear and convincing evidence of subjective intent to deceive in 1997, especially since Zobmondo has not challenged that Heimberg and Gomberg had a bona fide intent to use the "Would you rather . . .?" mark on games starting in June 2003, during the very time when this evidence arose.

Zobmondo also repeatedly argues that there is a negative inference to be drawn from the fact that Heimberg and Gomberg sought and obtained all possible extensions of time to file their statement of use.  But absent a subjective intent to deceive the PTO during this time, there is nothing wrong with Heimberg and Gomberg requesting (and being granted) all of the available statutory extensions.  Congress created the intent-to-use system and the Court will not treat compliance with statutory procedures as evidence of fraud.  Indeed, Heimberg and Gomberg are far from the only ones to have used the full set of procedures created by Congress: as of 2008, almost 15,000 registrations had been issued after the maximum number of extensions was granted.  Thus, Zobmondo cannot demonstrate fraud by pointing to the authorized use of the full system of statutory extensions.

### CONCLUSION

The undisputed facts defeat any possibility of Zobmondo carrying its burden to show by clear and convincing evidence that Heimberg and Gomberg subjectively intended to deceive the PTO at any time during the ITU registration process.  The Court therefore GRANTS Spin Master's motion for summary judgment on Zobmondo's § 1064(3) cancellation counterclaim based on fraud on the PTO.

DATED:      February 22, 2011       _____
                                    **AUDREY B. COLLINS**
                                    **CHIEF UNITED STATES DISTRICT JUDGE**